IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


RHONDA D. SMEDLEY,

      Plaintiff,

vs.                          Case No. 4:06cv497-MP/WCS

P.A. STOVER, P.A. PICKENS,
P.A. MEJIA, DR. CARBONELL,
and MRS. WEST,

      Defendants.

_____/


## REPORT AND RECOMMENDATION

Before the Court is Defendants' amended motion for summary judgment.  Doc.
30.  The *pro se* Plaintiff was advised to respond in accordance with Rule 56, doc. 31,
and has received several extensions of time due to improperly submitted documents.
*See* docs. 33, 34, 39, 42, and 44.  Plaintiff did submit a document, doc. 43, which has
been construed as her response in opposition to the "amended motion for summary
judgment."  Docs. 43, 44.  The amended motion for summary judgment, doc. 30, is
ready for a ruling.

**Plaintiff's allegations, doc. 14**

In her second amended complaint, doc. 14, Plaintiff brings Eighth Amendment claims against five Defendants - three of whom are physician assistants (Stover, Mejia, and Pickens), one is a medical doctor (Carbonell), and one is the health administrator (West) at F.C.I., Tallahassee.  Plaintiff alleged that she was not provided proper medical care for her left leg, back, and left arm, and sought monetary damages for pain and suffering.  *Id.*  She specified the following five dates as to when each Defendant allegedly failed to provide her proper medical care:  June 17, 2005; May 24, 2006; August 11, 2004; February 28, 2005; and June 7, 2006.  Doc. 14, pp. 9-11.

**Defendant's arguments in support of summary judgment, doc. 30**

Defendants contend that Plaintiff has failed to state a claim for a violation of her Eighth Amendment rights in that Plaintiff cannot demonstrate that she has a serious medical need or that the medical care she received "placed her at a substantial risk of serious harm."  Doc. 30, p. 18.  Defendants further contend that Plaintiff's claim fails because she cannot prove that Defendants "had knowledge of an objectively serious medical need that was not being met."  *Id.*, at 20.  Defendants assert that Plaintiff was given treatment "each time she requested medical attention" and that she simply disagrees with the course of treatment prescribed.  *Id.; see also* p. 27.  Furthermore, they contend no Defendant was deliberately indifferent to Plaintiff's medical needs.  *Id.*, at 21-25.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex

Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement constitutes grounds for denial of the motion."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  The Local Rule provides that the party opposing the motion shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  Finally, the Local Rule provides that the movant's properly filed statement of undisputed facts will be deemed to be admitted unless controverted by the opposing party in the manner specified by the Rule.  *See* Jones v. Gerwens, 874 F.2d 1534, 1537 n.3 (11th Cir. 1989) (determining that plaintiff's failure to controvert defendants' statement of undisputed facts filed in compliance with a similar local rule of the Southern District of Florida constituted an admission that such facts were not disputed for summary judgment purposes.)

**Rule 56 evidence[1]**

Plaintiff arrived at the Federal Correctional Institution in Tallahassee (hereinafter "FCI") on August 11, 2004.  Doc. 30, p. 1; doc. 30, attachment 1 (doc. 30-2, p. 1).[2]  Prior

---

[1] Although Plaintiff identifies only five occasions as to when her Eighth Amendment rights were violated, it is in examining the more detailed list of Plaintiff's medical treatment that this claim can properly be examined.  So to have a complete picture of Plaintiff's medical care, all relevant dates and treatment are provided.

[2] Hereafter, all references to exhibits are to those attached to document 30, unless otherwise noted.  References are to the paper copy and page number, followed

to her arrival, a medical history was completed on or about August 3, 2004, by Nurse D. Mann.  Doc. 30, p. 1; doc. 30, attachment 2 (doc. 30-2, pp. 4-5).  The report contains the following note: "car accident 1998 left leg nerve and muscle damage muscle spasm in thoracic area disciplinary problems in lumbar."  Doc. 30, p. 1; doc. 30, attachment 1 (doc. 30-2, p. 4).  The report further indicated Plaintiff "sometimes" wore a brace or back support, and that Plaintiff previously had or currently has:  swollen or painful joints; sinusitis; adverse reaction to drug or medicine; tumors, growth, cyst, cancer; arthritis, rheumatism; bone, joint or other deformity; car, train, sea or air sickness; frequent trouble sleeping; depression or excessive worry; loss of memory or amnesia; nervous trouble; excessive alcohol use; drug use or addiction; marijuana; cocaine; high or low blood pressure; cramps in her legs; frequent indigestion; intestinal trouble; recurrent back pain; neuritis; and had a change in menstrual pattern.  Doc. 30, p. 2; doc. 30, attachment 2 (doc. 30-2, pp. 4-5).  The following questions also contained positive responses: Have you been refused employment or been unable to hold a job or stay in school because of: (b) inability to perform certain motions; (c) inability to assume certain positions; and (d) other medical reasons.  Doc. 30, p. 2; doc. 30, attachment 2 (doc. 30-2, p. 5).  Plaintiff reported being treated for a mental condition, having previously had operations at age 18, 20, and 21, and been a hospital patient.  *Id.*  She reported treatment within the past 5 years for more than a minor illness, and stated she had received disability SSI benefits of $553 and $431.  *Id.*  In Plaintiff's medical records from Oklahoma, a notation made just prior to her arrival at FCI, Tallahassee, it states Plaintiff

by a reference (in parenthesis) to the corresponding document and page in the electronic docket.  Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

had been taking 100 mg. of Zoloft for depression.  Doc. 30, p. 3; doc. 30, attachment 3 (doc. 30-2, p. 6).

When Plaintiff arrived at FCI, she had an intake screening conducted by Defendant Pickens.  Doc. 30, p. 4; doc. 30, attachment 1 (doc. 30-2, p. 1-2).  Plaintiff complained of low back pain and she was prescribed 600 mg. of Motrin to take every twelve hours (with food) as needed for pain.  Doc. 30, p. 4; doc. 30, attachment 1 (doc. 30-2, p. 3).  On the "administrative note" which is listed on the "symptoms, diagnosis, treatment" form, it appears that the prescription was ordered by Defendant Mejia.  Doc. 30, attachment 1 (doc. 30-2, p. 3).  Plaintiff's only allegation against Defendant Pickens was for failing to properly evaluate and provide medical care on August 11, 2004.  Doc. 14, p. 9.

Several days later, on August 18, 2004, Defendant Stover completed Plaintiff's intake physical examination.  Doc. 30, p. 4; doc. 30, attachment 5 (doc. 30-2, p. 8).  Defendant Stover recommended Plaintiff stop smoking, lose weight through diet and exercise, and since it was noted that Plaintiff's last pap smear was in 2003, Plaintiff was given a pap smear.  Doc. 30-2, pp. 8-12.  Plaintiff's examinations were generally "normal" and she was deemed qualified for "regular housing/regular duty."  *Id.*, at 11.  The medical record indicates Plaintiff would be scheduled for a follow up appointment in mental health, noting that she had a history of depression.  *Id.*

The cytology report for the pap smear given on August 18, 2004, was "negative for intraepithelial lesion or malignancy" but found "organisms: Trichomonas vaginalis."  Doc. 30, attachment 6 (doc. 30-2, p. 12).  The notation on the report shows Plaintiff

would be scheduled for treatment.  *Id.*  The report is signed by both Defendants Stover and Carbonell.  *Id.*

On September 9th, Defendant Stover followed up with Plaintiff concerning the abnormal pap smear and at that time, Plaintiff requested a refill of Motrin for her low back pain.  Doc. 30, p. 5; doc. 30, attachments 6, 7 (doc. 30-2, p. 12-13).  Defendant Stover prescribed Motrin 800 mg. three times a day, and Flagyl for a vaginal infection.  The Motrin prescription was an increased from the 600 mg. prescription given on August 11th.  Doc. 30, attachment 7 (doc. 30-2, p. 13).

Defendant Stover saw Plaintiff again on October 21, 2004, for "chronic" low back pain.  Doc. 30, p. 5; doc. 30, attachment 8 (doc. 30-2, p. 14).  The record reveals Plaintiff has had back pain since a motor vehicle accident in 1998.  *Id.*  Defendant Stover's examination revealed good range of motion in Plaintiff's back.  *Id.*  She was prescribed Naprosyn 275 mg. three times a day and advised to return as needed.  *Id.*

Plaintiff had a chronic care clinic appointment on October 27, 2004, and was evaluated by Defendant Carbonell.  Doc. 30, p. 5; doc. 30, attachment 9 (doc. 30-2, p. 15).  Plaintiff complained of knee pain and reported her pain as an 8 on a scale of 10, with 0 being no pain and 9-10 as worst pain.  Doc. 30, p. 5; doc. 30, attachment 9 (doc. 30-2, p. 15).  Defendant Carbonell's examination showed a "normal" range of motion and no swelling.  Doc. 30, pp. 5-6; doc. 30, attachment 9 (doc. 30-2, p. 16).  Plaintiff's Naprosyn prescription was increased to 500 mg. two times a day.  Doc. 30, p. 6; doc. 30, attachment 9 (doc. 30-2, p. 16).  The record also notes that Plaintiff had a history of depression, but reported feeling "more stable" then.  Doc. 30, pp. 5-6; doc. 30, attachment 9 (doc. 30-2, p. 15-166).  Plaintiff was prescribed Zoloft 100 mg. and would

return for a follow-up in January, 2005, or sooner if needed.  Doc. 30, attachment 9

(doc. 30-2, p. 16).

On December 13, 2004, Plaintiff returned to the medical department complaining

of arthritis in her knees and low back pain.  Doc. 30, p. 6; doc. 30, attachment 10 (doc.

30-2, p. 17).  Defendant Stover examined Plaintiff and found she had a good range of

motion in both her knees and back.  Doc. 30, p. 6; doc. 30, attachment 10 (doc. 30-2, p.

17).  Defendant Stover presecribed 500 mg. of Tylenol three times a day.  Doc. 30, p. 6;

doc. 30, attachment 10 (doc. 30-2, p. 17).

Plaintiff reported a "flare up" of arthritis, especially in her left leg.  Doc. 30, p. 6;

doc. 30, attachment 10 (doc. 30-2, p. 17).  Again, Defendant Stover noted a good range

of motion in left leg.  *Id.*  Plaintiff was prescribed 600 mg. of Motrin, three times a day, in

addition to 500 mg. of Tylenol, also to be taken three times daily.  Doc. 30, p. 6; doc. 30,

attachment 10 (doc. 30-2, p. 17).

In January, 2005, Plaintiff was treated by Defendant Stover for sinus congestion,

low back pain, and numbness in her left leg.  Doc. 30, p. 6; doc. 30, attachment 11 (doc.

30-2, p. 18).  Plaintiff had good range of motion in her left leg and back, and good

sensitivity in the left leg.  *Id.*  Plaintiff's pain scale was listed as 1/3, and the prescription

for Motrin was increased to 800 mg., three times daily.  *Id.*  Defendant Stover asked

Plaintiff to obtain her records from the hospital where she received treatment for her

back injury following the motor vehicle accident in 1998.  *Id.*  Her pain medication was

refilled on February 25, 2005.  Doc. 30, attachment 11 and 12 (doc. 30-2, pp. 18, 19).

The only claim Plaintiff presented in her second amended complaint against Dr. Carbonell concerned treatment on February 28, 2005.[3]  Doc. 14, p. 10.  The medical records show Plaintiff was evaluated by Defendant Carbonell in the chronic care clinic. Doc. 30, p. 6; doc. 30, attachment 13 (doc. 30-2, p. 20).  Plaintiff reported not having been taking Zoloft for three months and said she did not think she needed it any more. Doc. 30, p. 6; doc. 30, attachment 13 (doc. 30-2, p. 20).  Plaintiff denied have symptoms of depression.  *Id.*  As for her pain, she continued to complain of pain in her lower back and reported it as an 8 on the pain scale.  Doc. 30, pp. 6-7; doc. 30, attachment 13 (doc. 30-2, p. 20).  Plaintiff reported that Motrin helped her a "little bit to deal with the pain."  Doc. 30, p. 7; doc. 30, attachment 13 (doc. 30-2, p. 20).  Defendant Carbonell's examination revealed pain in the middle of the lower back, which was non-radiating at that time.  Doc. 30, p. 7; doc. 30, attachment 13 (doc. 30-2, p. 21).  Defendant Carbonell ordered an x-ray of Plaintiff's lower back and prescribed 800 mg. of Motrin, three times daily.  Doc. 30, p. 7; doc. 30, attachment 13 (doc. 30-2, p. 21).

Plaintiff had a lumbar spine x-ray taken on March 14, 2005.  Doc. 30, p. 7; doc. 30, attachment 15 (doc. 30-2, p. 23).  The results showed mild hypertrophic spurring in the lower spine, otherwise negative.  Doc. 30, p. 7; doc. 30, attachment 15 (doc. 30-2, p. 23).  There was "no evidence of disease or abnormality seen."  *Id.*

---

[3] Plaintiff claimed the Defendant did not provide medical care and properly evaluate her condition.  Doc. 14, p. 10.  Plaintiff further alleged that Defendant Carbonell should have ordered blood work to check for problems associated with her use of Motrin.  *Id.*  She further alleged Defendant Carbonell should have provided an alternate treatment plan to control her pain since the Motrin was not "providing pain relief."  *Id.*

On May 10, 2005, Plaintiff complained of "back, left arm and leg pain."  Doc. 30, p. 7; doc. 30, attachment 16 (doc. 30-2, p. 24).  Plaintiff reported taken Ibuprofen.  Doc. 30, attachment 16 (doc. 30-2, p. 24).  Defendant Stover examined Plaintiff and noted "good" range of motion for any movement.  Doc. 30, p. 7; doc. 30, attachment 16 (doc. 30-2, p. 24).  Defendant Stover refilled Plaintiff's prescription for Motrin, 800 mg. and advised her to follow-up as needed.  Doc. 30, p. 7; doc. 30, attachment 16 (doc. 30-2, p. 24).

Plaintiff reported to the chronic care clinic on May 13, 2005, reporting pain (score of 7) in left arm during the past week.  Doc. 30, p. 7; doc. 30, attachment 17 (doc. 30-2, p. 25).  The examination revealed good range of motion and no swelling.  *Id.*  Plaintiff reported having been taking Tylenol, and Defendant Carbonell prescribed Naprosyn 550 mg. three times a day.[4]  *Id.*  At this time, since Plaintiff was no longer taking medications for depression and had no complaints concerning her mental health, she was removed from the chronic care clinic.  Doc. 30, pp. 7-8; doc. 30, attachment 17 (doc. 30-2, pp. 24-25).

Plaintiff returned to the medical department on May 23, 2005, reporting again of "pain in back, swelling in legs and arms, left leg pain."  Doc. 30, p. 8; doc. 30, attachment 18 (doc. 30-2, p. 27).  Upon examination, Plaintiff had good range of motion in back movement and Defendant Stover prescribed 800 mg. Motrin, three times daily.  Doc. 30, p. 8; doc. 30, attachment 18 (doc. 30-2, p. 27).  Defendant Stover also recommended that Plaintiff use warm moist heat daily.  *Id.*

---

[4] There is a hand-written notation on that report which possibly indicates that Plaintiff might have to return to Motrin.  Doc. 30, attachment 17 (doc. 30-2, p. 26).  Unfortunately, that comment is not entirely legible.

Plaintiff's claim against Defendant Stover concerned treatment rendered on June 17, 2005.[5]  Doc. 14, p. 9.  Plaintiff reported "left leg damage and pain, back pain, left arm hardening and pain, knee and ankle swelling and pain."  Doc. 30, p. 8; doc. 30, attachment 19 (doc. 30-2, p. 28).  Plaintiff listed her pain as a 9 on the 0 (no pain) - 10 (worst pain) scale.  Doc. 30, attachment 19 (doc. 30-2, p. 28).  She stated she was taking Motrin, Tylenol, and aspirin, but indicated her treatment for pain was not effective *Id.*  Plaintiff had good range of motion in her arms and hands.  Doc. 30, p. 8; doc. 30, attachment 19 (doc. 30-2, p. 28).  Defendant Stover prescribed 800 mg. Motrin, three times daily, and directed Plaintiff to return to the clinic if her symptoms persisted or increased.  Doc. 30, p. 8; doc. 30, attachment 19 (doc. 30-2, p. 29).

Plaintiff returned on June 24, 2005, reporting problems now with arthritis in her right arm with "swelling & hardening" and pain in her back and left leg.  Doc. 30, p. 8; doc. 30, attachment 20 (doc. 30-2, p. 30).  Plaintiff reported having pain "all over" and again said her pain treatment was not effective.  Doc. 30, p. 8; doc. 30, attachment 20 (doc. 30-2, p. 30).  Plaintiff did indicate her pain level had gone down to a 7, and she reported taking Ibuprofen, Tylenol, and aspirin.  *Id.*  Defendant Stover's examination of Plaintiff revealed "both arms and hands with noted edema and increased pain to any palpation of forearms."  Doc. 30, p. 8; doc. 30, attachment 20 (doc. 30-2, pp. 30-31).  Plaintiff's case was discussed with Defendant Carbonell, the Clinical Director, who advised to have Plaintiff continue with Motrin, and added 325 mg. of Aspirin daily.  *Id.*  Defendant Carbonell also ordered lab tests, and Plaintiff was prescribed a Medrol Dose

---

[5] Plaintiff alleged that Defendant Stover failed to properly evaluate her, failed to "provide blood work," and did not provide an alternate treatment plan to manage Plaintiff's pain.  Doc. 14, p. 9.

Pack, a corticosteroid drug used to treat inflamation, swelling, and pain.  Doc. 30, pp. 8-9; doc. 30, attachment 20 (doc. 30-2, p. 30).  Plaintiff was placed on convalescence status through June 28, 2005.[6]  Doc. 30, p. 9; doc. 30, attachments 20, 21 (doc. 30-2, pp. 30-31, 33).  By June 29th, the lab tests previously ordered were completed.  Doc. 30, p. 9; doc. 30, attachment 22 (doc. 30-2, p. 34).  All results were within normal limits. *Id.*

Plaintiff went to the clinic on July 11, 2005, with an injury to her left land.  Doc. 30, p. 9; doc. 30, attachment 23 (doc. 30-2, p. 35).  Plaintiff reported having her "left hand smashed at work" and pain (at a level of 10) in her fingers for the past 3 days.  Doc. 30, p. 9; doc. 30, attachment 23 (doc. 30-2, pp. 35-36).  Defendant Stover examined Plaintiff, noted edema and decreased range of motion to the fourth and fifth fingers on her left hand, and ordered an x-ray.  *Id.*  The x-ray revealed a non-displaced fracture of the distal tip (phalanx) of the left, fifth finger and Plaintiff's finger was splinted in the neutral position.  Doc. 30, p. 9; doc. 30, attachments 23, 24(doc. 30-2, pp. 36, 37).  Plaintiff was again placed on convalescence status through July 15th.[7]  Doc. 30, p. 9; doc. 30, attachments 23, 25 (doc. 30-2, pp. 36, 38).  Plaintiff was taking Ibuprofen, and a prescription for 500 mg. of Keflex was also ordered.  Doc. 30, p. 9; doc. 30, attachment 23 (doc. 30-2, p. 36).

---

[6] Notably, the convalescence slip shows Plaintiff's work detail as being "Landscape."  Doc. 30, attachment 21 (doc. 30-2, p. 33).  Although the precise nature of Plaintiff's detail is unexplained, such a work detail may presumably cause back pain.

[7] This second convalescence slip shows Plaintiff's work detail remains "Landscape."  Doc. 30, attachment 25 (doc. 30-2, p. 38).

Plaintiff had a follow-up with Defendant Stover on July 15th for her left hand fracture.  Doc. 30, p. 9; doc. 30, attachment 26 (doc. 30-2, p. 39).  Plaintiff also complained of aches in her left leg and knees, and back pain.  *Id.*  Plaintiff was on 800 mg. of Motrin and no new prescription was ordered.  *Id.*  Plaintiff's dressing was changed and her convalescence was extended through July 29th.  Doc. 30, p. 9; doc. 30, attachments 26, 27 (doc. 30-2, pp. 39, 40).  Plaintiff had another follow-up on July 18th for the same complaints.  Doc. 30, p. 9; doc. 30, attachment 28 (doc. 30-2, p. 41). She again reported that her treatment for pain was not effective, and described her pain as being between 5 and 7.  *Id.*  Plaintiff's prescription of 800 mg. of Ibuprofen was continued, as was her convalescence (through July 29, 2005).[8]  Doc. 30, p. 9; doc. 30, attachments 27-28 (doc. 30-2, pp. 40-42).

Plaintiff saw Defendant Stover again on August 9, 2005, complaining of back pain, left leg pain, muscle spasms, finger pain, and arthritis.  Doc. 30, p. 9; doc. 30, attachment 29 (doc. 30-2, p. 43).  Plaintiff reported that she was supposed to receive 800 mg. of Motrin, but had not had any since July 31st.  Doc. 30, attachment 29 (doc. 30-2, p. 43).  She was given another prescription for Motrin.  Doc. 30, p. 9; doc. 30, attachment 29 (doc. 30-2, p. 43).

On August 19th, Defendant Carbonell requested a follow-up x-ray of Plaintiff's hand.  Doc. 30, p. 9; doc. 30, attachment 29 (doc. 30-2, pp. 44-45).  The x-ray, taken on August 23, 2005, showed that Plaintiff's fractured finger had healed, and no other

---

[8]  The third convalescence slip continues to list Plaintiff's work detail as "Landscape."  Doc. 30, attachment 27 (doc. 30-2, p. 40).  The later convalescence slips that appear in this record do not show a work detail for Plaintiff.

abnormalities were seen.  Doc. 30, pp. 9-10; doc. 30, attachments 29-30 (doc. 30-2, pp. 44-45).

Plaintiff had another pap smear taken on August 25, 2005, as ordered by Defendant Stover.  Doc. 30, p. 10; doc. 30, attachments 31, 32 (doc. 30-2, pp. 46-47).  The results were "negative for intraepithelial lesion or malignancy."  Doc. 30, p. 10; doc. 30, attachment 32 (doc. 30-2, p. 47).

Defendant Stover saw Plaintiff again on September 26, 2005, for complaints of "severe back pain, muscle spasms, arthritis, left leg damage, pain left hand fingers spasming."  Doc. 30, p. 10; doc. 30, attachment 33 (doc. 30-2, pp. 48-49).  Plaintiff reported having pain "all over," said it was at a 9, that she was taking 800 mg. of Ibuprofen, but that it was not effective for treating her pain.  Doc. 30, attachment 33 (doc. 30-2, p. 44).  In addition to the 800 mg. of Motrin, Plaintiff was given a prescription for 500 mg. of Tylenol and Defendant Stover identified this as "arthritic-type pain."  Doc. 30, p. 10; doc. 30, attachment 33 (doc. 30-2, pp. 48-49).

Plaintiff had another medical appointment on October 27, 2005, complaining of back pain, left arm pain, left leg pain, muscle spasms, and sinus problems.  Doc. 30, p. 10; doc. 30, attachment 34 (doc. 30-3, p. 1).  Plaintiff requested refills for her medication, and Defendant Stover gave her Motrin, 800 mg., and Tyleno, 500 mg.  Doc. 30, p. 10; doc. 30, attachment 34 (doc. 30-3, pp. 1-2).  Although Plaintiff reported again that her treatment for pain was not effective, she rated her pain level at only a 2.  Doc. 30, p. 10; doc. 30, attachment 34 (doc. 30-3, p. 1).  Plaintiff was found to have good range of motion and deemed to have "multiple arthritic type of pain."  Doc. 30, attachment 34 (doc. 30-3, pp. 1- 2).

Plaintiff saw Defendant Stover again on December 12, 2005, for her continued complaints of back pain, "left leg nerve damage, muscle spasms, arthritis, more pain in left arm & leg."  Doc. 30, p. 10; doc. 30, attachment 35 (doc. 30-3, p. 3).  Plaintiff reported having pain "everywhere," but rated her pain as a 2.  Doc. 30, attachment 35 (doc. 30-3, p. 3).  Plaintiff was continuing to take Motrin, 800 mg., Tylenol, 500 mg., and aspirin, and her prescriptions were renewed.  *Id.*

On January 13, 2006, Defendant Mejia examined Plaintiff for complaints of back pain, (cervical, thoracic and lumbar), muscle spasms in thoracic area, and pain and numbness "from butt down through legs to toes."  Doc. 30, p. 10; doc. 30, attachment 36 (doc. 30-3, p. 5).  Plaintiff rated her pain as a 3, and noted she had been on Motrin 800 mg. and Tylenol 500 mg.  Doc. 30, attachment 36 (doc. 30-3, p. 5).  Defendant Mejia prescribed Indocin 25 mg every 8 hours as needed for pain.  Doc. 30, pp. 10-11; doc. 30, attachment 36 (doc. 30-3, pp. 5-6).  Defendant Mejia did not observe or feel any muscle spasms.  *Id.*  Plaintiff was referred to a wellness class and dietician for weight loss.  Doc. 30, pp. 10-11; doc. 30, attachment 36 (doc. 30-3, pp. 5-6).

Plaintiff returned on February 16, 2006, for the same complaint of cervical and thoracic muscle spasms and lumbar pain, and additionally reported that she "had degenerative disks in her lower spine and discogenerative."  Doc. 30, p. 11; doc. 30, attachment 37 (doc. 30-3, pp. 7-8).  Plaintiff was treated by Defendant Pickens who found tenderness along the lumbar spine, consistent with the x-ray findings from March 14, 2005 (mild hypertrophic spurring in the lower spine).  Doc. 30, p. 11; doc. 30, attachment 37 (doc. 30-3, p. 7).  Defendant Pickens "gave Plaintiff a 2 day

convalescence and advised her to continue stretching." Doc. 30, p. 11; doc. 30, attachment 37 (doc. 30-3, p. 8).

On February 21, 2006, MLP Blanco examined Plaintiff who was complaining of cervical, thoracic, and lumbar pain, nerve damage to left leg, and numbness and pain in both legs and buttocks. Doc. 30, p. 11; doc. 30, attachment 38 (doc. 30-3, p. 9). Plaintiff was not evaluated, but given another 2 day convalescence and advised to return on February 23rd. Doc. 30, p. 11; doc. 30, attachment 38 (doc. 30-3, pp. 9-10).

When Plaintiff returned on February 23, 2006, she continued to complain of pain in her back, muscle spasms, and numbness and pain that radiates through her buttocks down both legs. Doc. 30, p. 11; doc. 30, attachment 40 (doc. 30-3, pp. 11-12). Plaintiff reported not being able to sit or stand for long periods at a time, and numbness in the buttocks if she sits too long. Doc. 30, p. 11; doc. 30, attachment 40 (doc. 30-3, p. 11). She said she felt a "burning type ache." Doc. 30, p. 11; doc. 30, attachment 40 (doc. 30-3, p. 11). MLP Blanco noted "spasm in Plaintiff's thoracic and in her sciatic notch." Doc. 30, p. 11; doc. 30, attachment 40 (doc. 30-3, p. 11). Plaintiff was diagnosed with a "probable acute sciatica" and was prescribed Indocin 50 mg three times daily for two weeks, then decreased to 25 mg. three times daily. Doc. 30, p. 11; doc. 30, attachment 40 (doc. 30-3, p. 12). Plaintiff was advised to use ice, was provided back exercises, and was placed on convalescence status through March 4, 2006. Doc. 30, p. 11; doc. 30, attachments 40, 41 (doc. 30-3, pp. 12-13).

Defendant Mejia saw Plaintiff on March 17, 2006, for complaints of back pain, stomach pain and burning, vomiting and nausea. Doc. 30, p. 12; doc. 30, attachment 42 (doc. 30-3, p. 14). Plaintiff said she had been having stomach problems for four

days and had not eaten since March 16th.  Doc. 30, attachment 42 (doc. 30-3, p. 14).

Plaintiff reported that when she "was seen by Sawyers 3-16-06 around 2:15 pm and he"

suggested that she might have an ulcer.  Doc. 30, attachment 42 (doc. 30-3, p. 14).

Defendant Mejia noted mild to moderate tenderness in Plaintiff's abdomen and was

treated for nausea and vomiting with Phenergan 25 mg.  Doc. 30, p. 12; doc. 30,

attachment 42 (doc. 30-3, p. 15).

Another notation in the medical records indicates Plaintiff was seen by EMT

Griffiss on the following day, March 19, 2006.  Doc. 30, attachment 42 (doc. 30-3, p.

15).  Plaintiff was still complaining of upper abdominal pain with nausea and vomiting

and said she had not had any relief.  *Id.*  Plaintiff reported her pain as being a "10/10"

and her Phenergan was increased to 50 mg and she was directed to follow up with the

doctors.  *Id.*

On March 20, 2006, Plaintiff was seen by Defendant Pickens, again complaining

of abdominal pain which had continued since March 14, 2006.  Doc. 30, p. 12; doc. 30,

attachment 43 (doc. 30-3, p. 16).  The examination revealed tenderness, with active

bowel sounds "in all quads."  Doc. 30, attachment 43 (doc. 30-3, p. 16).  A notation

indicates GERD, and Plaintiff was prescribed Zantac, Tylenol, and Phenergan and put

in convalescence status.  Doc. 30, p. 12; doc. 30, attachment 43 (doc. 30-3, p. 16); *see*

*also* doc. 30, attachment 44 (doc. 30-3, p. 17).  She was also instructed to not eat after

6:00 p.m.  Doc. 30, p. 12; doc. 30, attachment 43 (doc. 30-3, p. 16).

The following day, March 21st, Plaintiff reported to medical again complaining of

nausea.  Doc. 30, attachment 43 (doc. 30-3, p. 16).  Her medical record indicates mild

tenderness in the abdomen but "[t]he bowel sounds are normal today."  *Id.*

On March 24, 2006, Plaintiff again sought treatment for abdominal pain and diarrhea.  Doc. 30, attachment 45 (doc. 30-3, p. 18).  Registered Nurse Salyers examined Plaintiff and directed her to have only a clear liquid diet for 24 hours, avoid dairy products for 3-6 days, and take "one capsule of Loperamide HCL after every loose stool, not to exceed eight capsules per day."  Doc. 30, p. 12; doc. 30, attachment 45 (doc. 30-3, pp. 18-19).  Plaintiff was directed to return to sick call for a follow-up if she had not improved within 48 hours.  *Id.*

Plaintiff returned to sick call on March 28, 2006, and reported "still suffering from the acute [gastritis]" and complaining of back pain, left leg nerve damage.  Doc. 30, p. 12; doc. 30, attachment 46 (doc. 30-3, p. 20).  Plaintiff said she still could not hold solid foods down and occasionally had diarrhea.  She indicated her medications were Prilosec, Loperamide, and Tylenol 500 mg.  *Id.*  The records indicate Defendant Mejia referred Plaintiff to the doctor and Plaintiff was examined that same day by Defendant Carbonell.  Doc. 30, attachments 46, 47 (doc. 30-3, pp. 20-21).

Defendant Carbonell diagnosed Plaintiff with gastritis.  Doc. 30, p. 12; doc. 30, attachment 47 (doc. 30-3, p. 21).  Plaintiff was directed to eat chicken broth for two days, and advised she could eat saltine crackers or soda crackers, but should have no citrus, soda, or coffee.  Doc. 30, p. 12; doc. 30, attachment 47 (doc. 30-3, pp. 21-22).  She was continued on Phenergan 25 mg. and put on convalescence status until April 1, 2006.  Doc. 30, pp. 12-13; doc. 30, attachments 47, 48 (doc. 30-3, pp. 21-23).

In April of 2006, Plaintiff signed an authorization to release medical records to and from a physician in Mississippi concerning her "chronic back" problems.  Doc. 30, p. 13; doc. 30, attachment 49 (doc. 30-3, p. 24).  Plaintiff next went to sick call for

treatment on her back on May 24, 2006.  Doc. 30, p. 13; doc. 30, attachment 50 (doc. 30-3, p. 25).

Plaintiff's claim against Defendant Mejia is for failing to provide proper care and evaluation on May 24, 2006.  Doc. 14, p. 9.[9]  Plaintiff complained of cervical, thoracic, lumbar pain numbness, and aching left leg and arm numbness and pain.  Doc. 30, p. 13; doc. 30, attachment 50 (doc. 30-3, p. 25).  She indicated she had suffered with back pain since 1998 and reported that her treatment for pain was not effective.  *Id.*  Plaintiff reported only being on 500 mg. of Tylenol and assessed her pain as being a 2 on the 0-10 scale.  *Id.*  Defendant Mejia ordered x-rays of Plaintiff's cervical, thoracic and lumbar spine.  Doc. 30, p. 13; doc. 30, attachment 50 (doc. 30-3, pp. 25-26).

The x-rays were taken on May 31, 2006, and showed "mild thoracic scoliosis" as to the thoracic spine.  Doc. 30, p. 13; doc. 30, attachment 51 (doc. 30-3, p. 27).  "No other abnormalities [were] identified," and the cervical spine showed "no evidence of fracture or subluxation."  *Id.*  There was no evidence of narrowing, the odontoid process was "intact" and no prevertebral soft tissue swelling was seen.  Doc. 30, attachment 51 (doc. 30-3, p. 27).  The x-ray for the lumbar spine revealed "mild hypertrophic spurring" on the lower lumbar spine."  Doc. 30, p. 13; doc. 30, attachment 52 (doc. 30-3, p. 28).  The findings were "no change from the previous examination" and no other "abnormalities" were seen.  *Id.*

Plaintiff was examined again by Defendant Carbonell on June 6, 2006, following receipt of the x-ray results.  Doc. 30, p. 13; doc. 30, attachment 53 (doc. 30-3, p. 29).

---

[9] Plaintiff claims this Defendant did not provide an alternate treatment plan for pain and did not give her "any type of pain medication."  Doc. 14, p. 9.

"No records had been received from her outside doctors."  Doc. 30, p. 13.  Plaintiff

advised that she had been in a car accident in 1998 when "her car was struck by a

school bus and she sustained back injuries with left leg nerve damage."  *Id.*  Plaintiff

complained of pain in her lower back, rating her pain at an 8 on the scale, and reported

the pain radiated down her left leg and foot with numbness.  Doc. 30, p. 13; doc. 30,

attachment 53 (doc. 30-3, p. 29).  Plaintiff also claimed to have pain in her left arm,

"with tingling and numbness."  *Id.*

Defendant Carbonell's examination of Plaintiff reveal no abnormalities to

Plaintiff's neck, back or lower extremities, and she had a normal range of motion.  Doc.

30, p. 14; doc. 30, attachment 53 (doc. 30-3, pp. 29-30).  Plaintiff's pulses and reflexes

were also normal, with "no gross deficit to neurological exam was noted."  Doc. 30, p.

14; doc. 30, attachment 53 (doc. 30-3, pp. 29-30).  Defendant Carbonell gave Plaintiff a

steroid injection to the lumbar facet joint on both sides of her lower back.  *Id.*  Plaintiff

was given a Medrol dose pack and 800 mg. of Motrin, three times daily, with written

instructions on how to perform back exercises.  *Id.*

On September 5, 2006, Plaintiff refused a breast examination and pap/pelvic

examinations, as well as vaccinations for tetanus, measles, mumps, and rubella.

Doc.30, p. 14; doc. 30, attachment 54 (doc. 30-3, p. 31).  However, Defendant Pickens

"conducted a pre-release medical/psychological evaluation" of Plaintiff on September 6,

2006.  Doc.30, p. 14; doc. 30, attachment 55 (doc. 30-3, p. 32).  Plaintiff was

recommended for a transfer and the Evaluation reports Plaintiff's medical status as

"minor medical problems only."  *Id.*

Plaintiff's final claim in this case was against Defendant West for failing on June 7, 2006, to provide proper medical treatment, institute an alternate treatment plan to control her pain, and ensure that Plaintiff was given treatment.  Doc. 14, p. 10.  There are no medical records concerning June 7, 2006.  Plaintiff has, however, provided a copy of her inmate request form which was sent to Defendant West on May 30, 2006, and which was responded to on June 7, 2006.  Plaintiff's ex. 8, p. 3, attached to doc. 43. Plaintiff complained that her medical records had not been received at FCI and that she had not gotten "reliable results" from medical.  *Id.*  Plaintiff also complained that when she goes to sick call, they take her money but are "no help."  *Id.*  Attached to the inmate request are copies of Plaintiff's inmate bank statement showing medical co-payments. *Id.*  The response from Defendant West was: "Dr. Carbonell has seen you and will follow up on your care."  *Id.*  That is the extent of the evidence concerning Defendant West's involvement.

**Analysis**

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994), *quoting* Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977). Deliberate indifference entails something more than negligence, but may be satisfied by something less than actions taken which were intended to cause harm.  Farmer v.

Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994) (holding that an official cannot be held liable under the Eighth Amendment unless he knows of, and disregards, and excessive risk of serious harm to an inmate); *see also* McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999) (finding that knowingly providing "grossly inadequate, and at times no care" to a prisoner was more than negligence).  An official does not have to believe that "a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842, 114 S.Ct. at 1981.  Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Combining the standards from Farmer (a prison conditions case) and Estelle (a medical care case), the Eleventh Circuit has clarified that there are four elements of an Eighth Amendment claim for the denial of medical care: "an objectively serious need,[10] an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), *cert. denied* 531 U.S. 1077 (2001); Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

Medical malpractice does not constitute deliberate indifference.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the

---

[10] An "objectively 'serious medical need' " has also been defined as "one that, if left unattended, "pos[es] a substantial risk of serious harm.' " Taylor v. Adams, 221 F.3d at 1258, *quoting* Estelle, 429 U.S. at 104, 97 S.Ct. at 291, and Farmer, 511 U.S. at 834, 114 S.Ct. at 1977.

prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991), citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). *See also* Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993).  In Estelle, the prisoner received treatment for his back injury (bed rest, muscle relaxants and pain relievers), but complained that more should have been done in the way of diagnosis, such as an X-ray or other tests.  The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic techniques or forms of treatment--is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.

Not responding to complaints of pain is an Eighth Amendment violation and qualified immunity is unavailable.  McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999). In McElligott, the court held that while Dr. Foley could not be held liable for failing to diagnose the prisoner's condition as cancer, the infrequent examinations rendered when compared with the prisoner's "nearly constant complaints" of severe pain, and the obvious physical deterioration accompanying those reports of pain, were sufficient evidence for a jury to conclude the doctor ignored a risk of serious harm.  182 F.3d at 1256.  The court explained that a "core principle of Eighth Amendment jurisdiction in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."  182 F.3d at 1257.  Where a jury can conclude that medical treatment in general, and pain

medication specifically, was "so cursory as to amount to no treatment at all" then a plaintiff has shown deliberate indifference.  McElligott, 182 F.3d at 1255, 1257.

The evidence in this case shows that Defendant Stover examined and provided treatment for Plaintiff on at least twenty separate occasions.  Plaintiff was treated for her complaints of pain, for a fractured finger, and for female health issues.  Plaintiff was never turned away without medications for her problems.  There is no evidence that Plaintiff requested treatment but was ignored, delayed, or not given consideration.

Plaintiff was examined and treated by both Defendants Mejia and Pickens on four separate occasions with each Defendant for a total of eight visits.  These Defendants also prescribed medications for her back pain, abdominal pain and nausea, ordered an x-ray and put her on convalescence status.  There is no evidence that either of these Defendants turned a deaf ear to Plaintiff's complaints or failed to take actions to remedy Plaintiff's situation and assist her.

Dr. Carbonell treated Plaintiff on six occasions, three of which were visits in the chronic care clinic, specifically for Plaintiff's depression.  The visits, however, provided treatment for more than just mental health issues as Plaintiff was treated for her complaints of knee, back, and arm pain.  Defendant Carbonell ordered an x-ray, prescribed medication, and gave steroid injections to provide relief to Plaintiff.  There is no evidence that Defendant Carbonell failed to act on Plaintiff's behalf, there is no evidence that this Defendant failed to provide medical care for Plaintiff, or ignored Plaintiff's complaints of pain.

The evidence in this case does not show that Defendants were deliberately indifferent to Plaintiff's serious medical need.  It is accepted that Plaintiff suffers from

chronic, routine back pain that radiates down her leg.  That may or may not be a "serious" medical condition.  The diagnostic tests, including x-rays, do not reveal serious medical needs but "mild hypertrophic spurring."  *See* <u>Valencia v. Lorimier</u>, 2008 WL 304713, *7 (E.D. Tex. 2008) (noting "some narrowing of the discs and spurring in the prisoner's back x-rays, but finding no deliberate indifference to serious medical needs); <u>Madison v. Ferrell</u>, 2007 WL 3253659, at *15 (S.D.Ala., 2007) (assuming without deciding that Plaintiff's "hypertrophic spurring" and "mild back Arthritis" was a serious medical need); *see, e.g.,* <u>Shires v. Sonnier</u>, 2006 WL 1731229 (M.D.Ala., 2006); <u>Anderson v. Bureau of Prisons</u>, 2005 WL 2314306, *9 (M.D.Pa., 2005). Nevertheless, even assuming that Plaintiff's condition was a serious medical need, Plaintiff has not come forward with any evidence to support a finding that any Defendant was deliberately indifferent to her needs.  It is undisputed that Plaintiff was repeatedly seen by many health care providers over a period of several years, was provided several diagnostic tests and x-rays to determine the extent of her injury and pain, and she was prescribed various medications for that pain.  Plaintiff's lay disagreement with the treatment she received in this case is "a classic example of a matter for medical judgment," <u>Estelle</u>, *supra*, which does not represent cruel and unusual punishment. Plaintiff has not shown a triable Eighth Amendment claim.

Plaintiff has attempted to present a genuine dispute of fact concerning the information Plaintiff provided when she arrived at FCI during the intake screening and during other sick call visits.  Doc. 43, p. 1-3, *et. seq.*.  Plaintiff has, however, pointed to what the medical records show and to the findings contained therein.  *Id.*  Plaintiff has not provided *evidence* that any of these records are incorrect.  Thus, that is not a

genuine dispute and, even if Plaintiff disagreed with that record, it is not relevant to show that any Defendant failed to provide appropriate medical care to Plaintiff in the *future* while she was confined at FCI.

Plaintiff also has *argued* that the medical records show she had good range of motion but she contends it has not been good since her car accident in 1998. *Id.*, at 3, 8, *et. seq.*, *citing to* Plaintiff's ex. 4.[11]  She also challenges that Defendants made visual examinations of her. *Id.*, at 3.  Plaintiff's *argument* is not *evidence* and there is nothing to show that the Defendants' evidence as to Plaintiff's movement abilities is incorrect. Moreover, it is not improper to determine one's range of motion by a visual observation of that motion and Plaintiff's dispute on this point is irrelevant.

To the degree Plaintiff challenges certain medical records as containing incorrect pain levels where the scores are low, Plaintiff has not provided evidence to support her dispute.  Doc. 43, pp. 3, 4, 6, et. seq.  Furthermore, even assuming Plaintiff was reporting more pain than noted in a particular record, there is still no evidence that her complaints of pain were ignored.  Plaintiff was routinely provided with pain medication and Plaintiff has not presented evidence that other medications were available, would have been more effective, but were not provided.  Indeed, the prescriptions given to Plaintiff are common medications for the level of discomfort Plaintiff expressed.  That is especially true considering that Plaintiff contends she has on-going, daily pain as a result of the car accident.  Pain management in that scenario proceeds at a different

---

[11] Plaintiff's exhibits are attached to her response, doc. 43.  These are, by and large, the same medical records provided by Defendants.  They were not scanned into the electronic docket and, thus, have no corresponding electronic document number. *See* fn. 2.

rate than for a broken bone, a muscle spasm, and other events which trigger pain as isolated events.  "The fact that the treatment was not as successful as [Plaintiff] would have liked is not proof of deliberate indifference."  Williams v. Smith County Jail, 2007 WL 527953, *5 (E.D. Tex., 2007), citing Mayweather v. Foti, 958 F.2d 91, 91 (5th Cir. 1992).

While Plaintiff complains that her pain medications were not working, the records reflect that Plaintiff's visits to sick call were on a fairly regular monthly basis.  That is more indicative of needing prescription refills to continue medication rather than the type of random and frequent visits expected of one who contends medications are not working.  The evidence does not reveal Plaintiff went to sick call just days apart to request more or additional medications for her pain.  Instead, she was returning on a rather routine basis.  Plaintiff has not presented evidence that her pain was not being managed.[12]

As for Plaintiff's complaint against Defendant West, there are no allegations that this Defendant was providing treatment to Plaintiff or was involved with her medical care at all beyond ensuring that Plaintiff was examined by medical staff.  Indeed, it appears from Plaintiff's response to the amended summary judgment motion, that she is attempting to hold Defendant West for her failure to arrange "outside treatment for the plaintiff seeing that the inside clinic wasn't relieving any pain."  Doc. 43, p. 5.  However, Plaintiff's Eighth Amendment rights are not violated simply by the fact that she is not taken outside FCI for medical care.  This claim is insufficient and must fail.

---

[12] Furthermore, this is not a case concerning improper job assignments or requiring Plaintiff to participate in activities beyond her abilities.  Doc. 43, p. 2.  Those arguments are not relevant to the issues at hand.

**CONCLUSION**

In short, Plaintiff has failed to present evidence showing that any Defendant was deliberately indifferent to her medical needs.  She was provided routine and timely care, she was always provided with pain medication, given convalescence passes, provided diagnostic x-rays, and examinations were provided regularly.  There is no evidence that Plaintiff's complaints were ignored or that Plaintiff was intentionally kept in pain. Defendants are entitled to summary judgment on all claims.

**RECOMMENDATION**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' amended motion for summary judgment, doc. 30, be **GRANTED** and that the order adopting this report and recommendation direct the Clerk of Court to enter judgment in favor of Defendants on all claims.

**IN CHAMBERS** at Tallahassee, Florida, on February 29, 2008.


 s/      William C. Sherrill, Jr.            
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**




**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**